J-S15044-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN THE INTEREST OF: M.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: J.K. | : | |
| | : | |
| | : | No. 1768 WDA 2019 |

Appeal from the Order Entered November 5, 2019
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000254-2018

BEFORE:   BENDER, P.J.E., OLSON, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:                    FILED MARCH 30, 2020

J.K. ("Mother") appeals the order of the Court of Common Pleas of Allegheny County involuntarily terminating her parental rights to her minor daughter, M.C. ("Child") pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).[1]   Mother claims the trial court abused its discretion in concluding that termination of her parental rights would best serve Child's needs and welfare pursuant to Section 2511(b).  We affirm.

The lower court summarized the factual background as follows:

Child was born [in May 2017] to [Mother] and [A.C. ("Father")].  Child came to the attention of the Allegheny County Office of Children, Youth, and Families ("CYF"), after Mother gave birth to Child at Magee Hospital due to parents' homelessness and significant mental health [issues].  Child was brought into the care of CYF on June 6, 2017, and adjudicated dependent on October

_____

* Former Justice specially assigned to the Superior Court.
[1] The trial court involuntarily terminated the parental rights of Child's father, A.C., who did not file an appeal and is not a party to the instant appeal.

18, 2017. At the adjudicatory hearing, Mother stipulated to [having issues with] mental health, domestic violence, and housing. It was reported that Mother and Father had just moved to Pittsburgh, PA from Florida, and were currently staying in an extended stay hotel and prior to the hotel had lived in their car. The family had a history of homelessness. Both parents reported having a history of mental health concerns including diagnoses of schizophrenia. Mother reportedly had no pre-natal care. Additionally, there were reports of [Father's] violent behavior and substance abuse[.]

At the adjudication hearing, the Court ordered Mother to have mental health treatment, domestic violence counseling, parenting [classes], assistance with housing, and consistent visitation and contact with the agency.[2] The Court ordered Father to mental health treatment, parenting [and] domestic violence classes, drug and alcohol assessments including treatment and urine screens, housing, [and] contact and visitation with the child. The agency developed a family plan to assist Mother and Father in accomplishing their goals. Mother attended all family planning meetings. Father did not attend any of the family planning meetings. Father has not been actively involved throughout the life of the case. Termination of Parental Rights (TPR) petitions were filed on December 20, 2018. The TPR Hearing was held November 1, 2019.

Trial Court Opinion (T.C.O.), 12/18/19, at 2-8 (citations omitted).

At the termination hearing, caseworker Rebecca Thompson testified that Mother complied with some of her goals by attending a domestic violence class while living in a shelter, obtaining housing through Western Psych's New Neighborhood living project, maintaining contact with CYF, and visiting Child consistently. Notes of Testimony (N.T.), 11/1/19, at 14-17.

Ms. Thompson's main area of concern was Mother's untreated mental health issues. As Mother conceded she had been diagnosed with

_____

[2] Mother was also ordered to have no contact with Father due to reports of his domestic violence.

schizophrenia and Post-Traumatic Stress Disorder (PTSD), the trial court ordered that Mother seek mental health treatment from a psychiatrist and cooperate with medication management. While Mother did attend "talk therapy," Mother refused to seek psychiatric treatment or medication management and became uncooperative in verifying her compliance with this goal since June 2019. Ms. Thompson felt that Mother's mental health was "deteriorating," noting that Mother had filed multiple affidavits accusing CYF of kidnapping Child and owing her money. N.T. at 13-16.

While Mother was initially permitted to have visitation with Child three times a week, Mother's visitation was gradually cut back to only one supervised visit each week. Although Mother was offered parenting programs through two separate agencies (Project Star and Holy Family), Mother was not able to close out either program successfully. N.T. at 12-13.

Amy Rendos, program manager for Project Star, indicated that Mother had difficulty understanding two-year old Child's needs when observing her cues. Mother would try to feed Child when she was not hungry, even when Child would reject the food and walk away from Mother. Mother would misinterpret Child's emotions in being upset over that fact that she was in foster care and not because she was tired. N.T. at 57-58.

Representatives from both Project Star and Holy Family reported that Mother struggled to provide Child with basic care, such as changing Child's diapers or giving her age-appropriate food, even when assisted by visitation coaches. Mother had trouble remaining calm, but would become

argumentative and ignore the directives from visitation coaches. On one occasion, Mother refused Child's request to go to use the bathroom at the CYF office, as she was concerned about germs. On another occasion, Mother called 911 after the visitation coach had directed her to change Child's diaper. N.T. at 17-18, 57-60, 74-78, 99-100, 110-111.

Multiple caseworkers expressed concern for Child's safety in Mother's care. Caseworker Emily Drizos testified that Mother lets Child "do really whatever she wants to do" as she is "afraid to redirect" Child. Ms. Drizos testified that when Mother and Child were on a walk during a visitation, Mother allowed Child, who was under two at that point, to walk near the road by herself. Mother did not want to upset Child, who would have a temper tantrum when Mother tried to hold her hand. N.T. at 75-76, 112.

CYF also presented evidence that Mother exhibited erratic behavior on multiple occasions in which Mother threatened the child's foster mother, C.F. ("Foster Mother"), caseworkers, and the CYF agency. Mother accused Foster Mother and one of the caseworkers of having sexual relationships with Father. Mother repeatedly barraged Foster Mother with emails until Foster Mother filed a police report to get her to stop. Mother's paranoid thoughts made her believe that everyone "was out to get her" or "working against her." Many of Mother's angry outbursts required intervention from police officers and occurred in the presence of Child, requiring that Child be comforted by caseworkers. N.T. at 49, 59, 76-78, 101-103, 112, 123-24.

Although Mother had been ordered not to have contact with Father, Mother admittedly did not comply with this order and appeared at two CYF visits with visible bruises and reported that Father "got rough" with her. In November 2017, Mother poured windshield wiper fluid in the gas tank of Father's truck. N.T. at 13-14, 45-46.

Ms. Thompson indicated that Child is in the care of Foster Mother, who is very attentive to Child and is meeting Child's educational, psychological, and developmental needs. Ms. Thompson noted that Child is a "very happy little girl" in the home of Foster Mother, who Child calls "momma." Ms. Thompson felt that Child and Foster Mother are "very bonded." N.T. at 22.

CYF also presented the testimony of Dr. Patricia Pepe, a licensed psychologist. In her first individual evaluation of Mother, Dr. Pepe reported that Mother's "paranoid ideations" prevented her from being in the state of mind to cooperate with the interview. In her second evaluation, Mother was able to maintain better direction and was able to disclose her psychiatric diagnoses and hospitalizations. Mother explained that she did not take her recommended medication, which made her feel "worse and dysfunctional." Mother also experienced "auditory hallucinations" and "general delusional thinking" during the evaluation. After conducting the interview and administering psychological testing, Dr. Pepe diagnosed Mother with schizophrenia and obsessive compulsive disorder. N.T. at 130-32.

Dr. Pepe also conducted several evaluations of Child's interactions with both Mother and was concerned about how Mother's schizophrenia would

affect her ability to keep Child safe. Dr. Pepe admitted that Mother exhibited positive parenting skills during one of the evaluations. However, in a subsequent evaluation, Mother became so agitated she began throwing objects and jumping. During this episode, Dr. Pepe was able to convince Mother to allow her to hold Child for her protection and then subsequently called the police. N.T. at 135-140.

While Dr. Pepe acknowledged that Mother deeply cares for Child, Dr. Pepe recognized that Mother's good intentions do not necessarily lead to positive outcomes. Dr. Pepe opined that the severance of the bond between Mother and Child would not cause serious harm to the Child and asserted that Child's continued exposure to Mother's unpredictable outbursts would be detrimental to Child. N.T. at 144-48.

Moreover, Dr. Pepe conducted an interactional interview with Child and Foster Mother in which Child showed positive attachment to Foster Mother, who she calls "momma." When Child appeared to be anxious in Dr. Pepe's office, Foster Mother was able to reassure Child and give her a snack. Overall, Dr. Pepe indicated that Foster Mother exhibited excellent parenting skills, was extremely knowledgeable about Child, and was very responsive to Child. Dr. Pepe testified that Child views Foster Mother as a psychological parent and is "extraordinarily attached to her." N.T. at 141-142.

At the conclusion of the termination hearing, the trial court entered an order involuntarily terminating Mother's parental rights under Sections 2511(a)(2), (5), and (8) of the Adoption Act and found that the termination

best served Child's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b). On November 27, 2019, Mother filed a timely notice of appeal along with a Concise Statement of Errors Complained of on Appeal pursuant to Pa.R.A.P. 1925(b).

Mother raises one issue for our review on appeal:

> Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S. § 2511(b)?

Mother's Brief, at 6.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." In re Adoption of S.P., [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." Id. "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." Id. The trial court's decision, however, should not be reversed merely because the record would support a different result. Id. at [325-26, 47 A.3d at] 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. See In re R.J.T., [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

In re T.S.M., 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence."

In re M.G. & J.G., 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." In re Adoption of T.B.B., 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights, governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." In re C.S., 761 A.2d 1197, 1201 (Pa.Super. 2000) (en banc) (quoting Matter of Adoption of Charles E.D.M., II, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998)).

In this case, the trial court terminated Mother's parental rights pursuant to Sections 2511(a)(2), (5), (8), and (b). As Mother concedes that CYF

presented sufficient evidence to justify termination of her parental rights under Section 2511(a), we need only analyze whether termination was proper under Section 2511(b).  Our Supreme Court has stated:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child."  23 Pa.C.S.[A.] § 2511(b).  The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability."  In re K.M., 53 A.3d 781, 791 (Pa.Super. 2012).  In In re E.M. [a/k/a E.W.C. & L.M. a/k/a L.C., Jr.], [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child.  The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.  In re K.M., 53 A.3d at 791.  However, as discussed below, evaluation of a child's bonds is not always an easy task.

In re T.S.M., 620 Pa. at 628-29, 71 A.3d at 267.  "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case."  In re K.Z.S., 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony.  Social workers and caseworkers can offer evaluations as well.  Additionally, Section 2511(b) does not require a formal bonding evaluation."  In re Z.P., 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted).

Moreover,

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

In re Adoption of C.D.R., 111 A.3d 1212, 1219 (Pa.Super. 2015) (quoting In re N.A.M., 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and citations omitted).

Mother asserts that CYF did not meet its burden to show that termination of her parental rights will best serve Child's needs and welfare as Mother visits Child consistently and Child "derives benefit from her relationship and contact with Mother." Mother's Brief, at 19. Specifically, Mother argues that CYF witnesses offered "speculative" testimony about Mother's mental health that only raised "concerns of potential risks as opposed to any events directly happening." Id. at 14, 19.

Upon review, the record supports the trial court's finding that Child's developmental, physical and emotional needs and welfare favor termination of Mother's parental rights pursuant to Section 2511(b). There was sufficient evidence to allow the trial court to make a determination of the Child's needs and welfare, and as to the existence or lack of existence of a bond between Mother and the Child such that, if severed, would not have a detrimental impact on Child.

As Child was taken from Mother's care upon her birth, Child has never been in Mother's care at any point in her life. Although Mother regularly attends supervised visitation sessions with Child, caseworkers and visitation coaches have consistently asserted that Mother has difficulty assessing and meeting Child's basic physical, emotional, and developmental needs. Several caseworkers have noted that Mother is afraid to redirect Child, a toddler, even in issues of safety, as she does not like to make Child upset. While Mother was provided with support from two different agencies, Mother failed to complete either parenting programs as she failed to cooperate with the visitation coaches and did not exhibit significant progress.

Ms. Thompson indicated that the main area of concern affecting Mother's ability to parent Child and provide for her needs and welfare is Mother's unstable mental health, which Ms. Thompson felt "directly impacts her ability to keep [Child] safe." N.T., 11/1/19, at 13, 17-20. As stated above, Mother refuses to submit to regular psychiatric treatment and medication for her schizophrenia.

In diagnosing Mother with schizophrenia, Dr. Pepe also expressed concern that Mother's severe mental health issues, if left untreated, would affect Mother's ability to parent Child as it could lead to unpredictable behavior, including paranoia, extreme anger, hallucinations, and a "total disconnect with the real world." N.T. at 135. Dr. Pepe explained:

> it's very unfortunate because with untreated schizophrenia [Mother] could have, you know, a range of symptoms which would include significant auditory hallucinations. And often in

schizophrenia there are what are called command hallucinations. So the hallucinations would actually command a person to do something which the person often follows through because they believe it's reality.

The problem with schizophrenia is it's living in reality but it's a different perception of reality. For example, the person does truly believe that they are, for example, being followed or people are stealing from them or people are out to get them and there is a degree of anxiety because there is a constant fear of something happening to them. There is not just the ability to remain stable over a period of time in terms of mood and affect and behavior so the concern is that the symptoms could override, could take over the person to such a degree that, for example, a young child would not be safe because, you know, the person can do unusual things or abscond with the child or abandon the child. I mean anything could happen.

It is very difficult to assess. But it is certainly a concern. And that's why many times individuals with schizophrenia are on medication because it helps to abate the symptoms to a large degree.

You know, I certainly believe that individuals with mental health issues are capable of parenting but I think you have to look at the severity of it and unfortunately, it's very unfortunate for [Mother], her symptoms kind of wax and wane and she is just not always in complete control and sometimes is so just obsessed with what she is believing in that she is really not centered in reality, reality in terms of the real world. Her own reality takes over.

N.T. at 133-135.

Caseworkers from various providers have testified to specific instances of Mother's erratic behavior on multiple occasions that required them to seek the assistance of police officers when Mother became so agitated that she lost all self-control. Mother's outbursts often occur in front of Child, who is often taken by caseworkers, who attempt to comfort her and prevent her from witnessing Mother's disturbing behavior.

While Dr. Pepe observed that Child had become accustomed to the routine of visitation with Mother, she has never been in Mother's care and has been subjected to the negative impact of Mother's unpredictable outbursts. We agree with the trial court's assessment that to the extent that Mother and Child have a bond, the termination of Mother's parental rights would not have detrimental effects on Child.

Moreover, Child recognizes Foster Mother as her psychological parent and is "extraordinarily attached to her." N.T. at 141-142. Child looks to Foster Mother for safety, security, and comfort and is thriving in her care. Foster Mother is able to assess and provide for Child's needs and has given her stability and continuity in the only home Child has ever known.

While Mother may profess to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. In re Z.P., 994 A.2d at 1121. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." Id. at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." In re B., N.M., 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Mother's parental rights under 23 Pa.C.S.A. § 2511(a) and (b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/30/2020